# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JUDITH LAFAVE, ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | **NO. 18-40062-TSH** |
| ANDREW SAUL,[1] ) | |
| Commissioner, Social Security Administration, ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### September 30, 2019

Hennessy, M.J.

The Plaintiff, Judith LaFave, proceeding pro se, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #14). The Commissioner seeks an order affirming his decision. (Docket #15).

By Order of Reference dated April 3, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #18), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Andrew Saul is substituted for Nancy A. Berryhill, as the Commissioner of the Social Security Administration as of June 17, 2019.

For the reasons that follow, I RECOMMEND that LaFave's Motion to Reverse (Docket #14) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #15) be ALLOWED.

I.      BACKGROUND

A.      Procedural History

LaFave filed an application for SSI on February 8, 2011, alleging that she had been disabled since January 1, 2011.  (Tr. 244).  The application was denied initially and on reconsideration. (Tr. 165-67, 170-72).

At the conclusion of a hearing on December 15, 2013, ALJ Leonard J. Cooperman made an oral pronouncement awarding benefits to LaFave.  (Tr. 513-57).  On January 10, 2014, ALJ Cooperman withdrew, by letter, his oral award of benefits based on his realization that he had failed to take into account the substantial lack of written medical evidence that would support LaFave's claim.  (Tr. 485-86).  A subsequent hearing before ALJ Cooperman was held on January 27, 2014.  (Tr. 483-512).  At the end of the hearing, ALJ Cooperman stated that he would leave the record open for six months to allow LaFave to submit additional evidence.  (Tr. 511).

On July 2, 2014, ALJ Cooperman issued an unfavorable decision, finding that LaFave had not been under a disability since January 24, 2011 through the date of decision.  (Tr. 47-57). LaFave filed a request for review of the decision on August 7, 2014.  (Tr. 61-64).  The Appeals Council granted LaFave's request for administrative review, and, on October 23, 2015, it vacated the hearing decision and remanded the case for further proceedings.  (Tr. 58-60).  The Appeals Council found that ALJ Cooperman did not provide a rationale for the assessed residual functional capacity ("RFC") limitations, and that ALJ Cooperman was not entitled to rely on the vocational expert's ("VE") testimony at step five.  (Id.).

The matter was re-assigned to ALJ Addison C.S. Masengill who held a hearing on July 12, 2016.[2]  (Tr. 454-82).  LaFave rejected the ALJ's offer to postpone the hearing so that she could obtain legal counsel, and signed a waiver of representation.  (Tr. 93, 458-60).  LaFave also rejected the ALJ's offer to keep the record open for twenty-one days following the hearing to submit additional documents, stating that there were no additional documents.  (Tr. 462).  On September 28, 2016, the ALJ issued a decision finding that LaFave had not been disabled from January 24. 2011 through the date of the decision.  (Tr. 28-46).  On March 8, 2018, the Appeals Council denied LaFave's request for administrative review, making the ALJ's decision final and ripe for judicial review.  (Tr. 19-22).  Having timely pursued and exhausted her administrative remedies before the Commissioner, LaFave filed a complaint in the Leominster Division of the District Court Department of the Commonwealth of Massachusetts on April 9, 2018.  (Docket #1-3).  The Commissioner removed the case to this court on May 2, 2018.  (Docket #1).  LaFave filed the motion for reversal on August 14, 2018, (Docket #14), and the Commissioner filed a cross-motion on September 25, 2018, (Docket #15).  On October 17, 2018, LaFave filed a reply to the Commissioner's motion.  (Docket #17).

B.    Personal History

At the time of her SSI application, LaFave was 53 years old.  (Tr. 244).  LaFave completed twelfth grade at a vocational school where she trained for nursing.  (Tr. 463).  She does not possess a driver's license.  (Tr. 100).  LaFave is married and lives in an apartment with her husband.  (Tr. 95).  LaFave previously worked as a certified nursing assistant in a nursing home, a painter in craft manufacturing, and in sales for an antique dealer, but does not have any past relevant work

---

[2] References to the "ALJ" from this point forward will refer to ALJ Masengill.

performed within fifteen years of the ALJ's decision.  (Tr. 45, 264).  LaFave reports that she has

not worked since 1997 as her second husband required her to stay home.  (Tr. 106).

C.      Medical History

On August 17, 2010, LaFave began a treatment relationship with Stephen Child, M.D.  (Tr.

401).  LaFave stated that she had experienced bizarre intermittent neurological symptoms over the

preceding four-and-a-half years, explaining that a "flareup" can cause stuttering and difficulty

speaking and left arm and leg immobility that prevents her from walking or working.  (Id.).  LaFave

indicated that it had "been difficult . . . to be certified as disabled which is her current aspiration."

(Id.).  Dr. Child noted that LaFave has an anxiety disorder which was controlled with Ativan

though she declined SSRI use, and that she also suffered from hypertension.  (Id.).  Physical

examination revealed strong shoulder shrug, supple neck, and extremities with symmetrical pulses

and no edema.  (Id.).  Dr. Child stated that LaFave's "neurological disorder likely has a large

functional component.  Moreover she has a known anxiety disorder and I again encouraged her to

try an SSRI.  She prefers to stick with Ativan.  She is also hoping to find a more sympathetic

neurologist."  (Id.).

In a letter dated January 7, 2011 to Dr. Child, Joshua D. Katz, M.D., noted that he evaluated

LaFave for possible multiple sclerosis.  (Tr. 419).  LaFave related to Dr. Katz that she had begun

having intermittent complex neurological spells in 2005.  (Id.).  The spells consisted of stuttering,

generalized muscle aching and heaviness of her arms and legs along with left arm and leg

numbness, weakness, sometimes progressing to her being almost completely incapacitated and

unable to speak for up to several hours.  (Id.).  In between the spells, LaFave reported "intermittent

hand numbness, clumsiness, frequently dropping things, thermal sensitivity, intermittent facial

pain, intermittent visual blurring, sensitivity to bright light, imbalance, neck pain, cracking in her

neck, and involuntary swallowing." (Id.). On physical examination, Dr. Katz found LaFave "awake and alert with normal language, memory, and attention." (Id.). LaFave had full muscle strength in the upper and lower extremities, normal muscle bulk and tone, normal sensation to pinprick, vibration, light touch, and position, normal gait and tandem gait, and normal fine motor movements in both hands. (Tr. 419-20). Dr. Katz observed that, with finger-to-nose testing, LaFave "hesitated and seemed to use more effort with her left hand just before touching the target but there was no dysmetria or tremor." (Tr. 420). Dr. Katz stated that "her spells are peculiar and don't fit well for seizures, strokes, or migraine." (Id.). Dr. Katz explained to LaFave that he "was not able to think of any other diagnostic tests that were likely to [] lead to a diagnosis" and did not recommend any specific treatment for the time being due to her history of medication sensitivity. (Id.). Dr. Katz noted that LaFave "was quite focused on the fact that without a diagnosis she would not be able to qualify for disability." (Id.). Dr. Katz noted that, despite having a normal neurological exam, LaFave told him "she could literally not pick up a book from my shelf without having a spell and having to go to the emergency room." (Id.). Dr. Katz stated he did "not have any explanation for the discrepancy between her perceived disability and her normal performance on neurological testing," but that it was "suggestive of a functional disorder." (Id.).

On March 19, 2011, Dr. Child stated that LaFave had long-standing complaints of intermittent weakness. (Tr. 422). Dr. Child noted that LaFave had seen at least five neurologists and had undergone numerous scans that ruled out multiple sclerosis. (Id.). Dr. Child observed that LaFave did not use a handheld assistive device and assessed that she could walk independently without an assistive device. (Tr. 421). Dr. Child stated he believed LaFave was "functional." (Tr. 422).

On July 31, 2011, LaFave presented to the emergency room complaining of the sudden onset of an inability to speak. (Tr. 364). LaFave denied experiencing joint pain, head trauma, headache, or the presence of significant stressors. (Tr. 364-65). On examination, LaFave was awake and alert and answered questions appropriately, but was slow to answer, very quiet, and had slow speech. (Tr. 365). LaFave was able to slowly move all four extremities, her strength was "apparently equal," and she had no abnormal sensory or neurological findings. (Tr. 366). She was assessed with a transient ischemic attack ("TIA") or "mini-stroke" and told to take one aspirin daily and follow-up in one to two days. (Tr. 367).

LaFave followed up with Dr. Child on August 8, 2011. (Tr. 396). LaFave related her symptoms at the emergency department but reported that "[s]he feels well now" and denied any symptoms. (Id.). Dr. Child noted that LaFave "has had some version of these symptoms for many years and has been evaluated by at least 3 neurologists. MRI scans and EEGs chemistries have all been normal." (Id.). Dr. Child wrote, "[a]s in the past, her main focus is to find a [diagnosis] that would justify being 'disabled.'" (Id.).

On August 30, 2011, state agency psychiatrist Dr. Garvin examined LaFave. (Tr. 426-27). LaFave attended with her husband but said "she could have come here alone today." (Tr. 426). She indicated that she cannot talk when she had an anxiety attack and experienced an elevated heartbeat at such times. (Id.). She reported that she was no longer depressed and denied having any of the classic symptoms of depression. (Id.). On examination, LaFave was fully oriented with good concentration, normal auditory memory, intact short-term auditory memory, low average to average intelligence, and no hallucinations or delusions. (Tr. 427). Dr. Garvin assigned LaFave a Global Assessment of Functioning ("GAF") score of 45.[3] (Id.).

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text

On October 7, 2011, LaFave presented at the emergency room complaining of chest and eye pain. (Tr. 375). On examination, LaFave was awake and cooperative with no tenderness or spasm in her back, no joint effusion or cyanosis, and grossly intact motor functions. (Tr. 376-77).

LaFave saw Stephanie Child, RN, on October 24, 2011 for her annual physical examination. (Tr. 394-96). Nurse Child observed that LaFave was in no distress and had symmetrical pulses and no edema in her extremities. (Tr. 395).

At a follow-up with Dr. Child on January 30, 2012 for hypertension, LaFave reported that "[o]verall, she feels well [and] [s]he is not having any more of her 'spells.'" (Tr. 393). LaFave was in no distress and had a normal physical examination. (Id.).

On May 8, 2012, LaFave had a follow-up with Dr. Child for hypertension. (Tr. 392-93). Dr. Child observed that LaFave was in no distress and had symmetrical pulses and no edema in her extremities. (Tr. 392).

LaFave presented to the emergency room on May 10, 2012 complaining of abdominal pain. (Tr. 381). She denied back pain, dizziness, or headaches. (Id.). On examination, LaFave was alert and cooperative with no tenderness with palpitation or deformity in her back, a supple and nontender neck, no edema or calf tenderness, and grossly intact sensory and motor functions. (Tr. 382).

On August 21, 2012, LaFave saw Dr. Child for a follow-up appointment related to her hypertension. (Tr. 391). During the visit, LaFave reported that she was "frustrated at her inability to be deemed disabled and receive SSI payments" and she blamed Dr. Child, telling him that he "filled out the forms incorrectly." (Id.). Dr. Child noted that LaFave "has not had any more 'spells' since she was made to understand [by Dr. Katz] that these are non-physiologic." (Id.). On

---

revision 2000). A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning. Id.

examination, LaFave was not in any distress, and her pulses were symmetrical with no evidence of edema.  (Id).  Dr. Child assessed benign hypertension and conversion disorder.  (Tr. 391-92). Dr. Child noted that he "recommended a psychiatric evaluation as her symptoms sound functional but she refused saying there was [nothing] wrong with her mentally or emotionally."  (Tr. 392).

On May 19, 2014, LaFave presented to Ritu Bagla, M.D., for a second opinion for her neck pain.  (Tr. 133-34).  LaFave reported that she had suffered from chronic intractable pain for nine years, and complained of "numbness that can sometimes involve her left fingertips and at other times her upper arm," and pain in her shoulders and hips.  (Tr. 133).  On examination, LaFave was alert and fully oriented, with intact attention, concentration, memory, and language.  (Tr. 134). She had no lower extremity swelling or tenderness and her shoulder movements were normal. (Id.).  Although her strength was limited by pain, Dr. Bagla found LaFave "to be strong throughout" with normal muscle tone and bulk, intact coordination in the upper and lower extremities, intact sensation to all modalities, and a steady tandem gait.  (Id.).  Dr. Balga reviewed LaFave's diagnostic tests and assessed them as follows: "An MRI of the brain done with gadolinium on 8/21/07 showed nonspecific white matter FLAIR abnormalities.  An MRI of her cervical spine done on 1/10/08 and 10/26/13 showed disc bulges.  An MRI of her thoracic spine . . . was essentially normal.  An EMG done on 3/21/08 was normal."  (Id.).  Dr. Bagla opined that LaFave's symptoms were not from a cervical radiculopathy and that she could have fibromyalgia or chronic pain disorder, and recommended LaFave undergo a consultation with the pain clinic. (Id.).

LaFave presented to Kameel Garas, M.D., on June 17, 2014 for a pain management consultation including evaluation of chronic neck, left shoulder, and arm pain.  (Tr. 129).  LaFave reported her pain was constant, dull, aching, throbbing, stabbing, and radiated to her left shoulder,

upper arm, and forearm, with tingling, numbness, and weakness. (Id.). She rated her pain at a five to eight on a ten-point scale and stated that she slept well at night but was limited in her daily activity because of pain. (Id.). She indicated that her pain increased with bending, riding in a car, weather changes, exercise, lifting, emotional stress, and coughing and sneezing. (Id.). LaFave reported taking ibuprofen as needed for pain but without much relief. (Id.). On examination, Dr. Garas observed that movement of LaFave's cervical spine was limited with pain, tenderness, and stiffness on flexion, extension, and lateral rotation. (Tr. 130). Neurological examination of both upper extremities including handgrip, flexion, extension of the elbow, and movement of the shoulder was within normal limits. (Id.). Dr. Garas noted that pinprick, biceps, and triceps reflexes were intact. (Id.). Dr. Garas found that LaFave had diffuse tenderness on deep palpation of the thoracolumbar spine with myofascial pain and tenderness. (Id.). Dr. Garas assessed cervical neuritis, cervical spondylosis, and myalgia and myositis. (Tr. 131). Noting that conservative treatment had failed so far, Dr. Garas suggested that LaFave may benefit from a cervical epidural steroid injection. (Id.). LaFave agreed and was scheduled to have the injection done at the next available appointment. (Id.). She was also started on Gabapentin for treatment of her myofascial chronic pain syndrome and neuropathy. (Id.). Dr. Garas counseled LaFave to stay active and avoid bed rest. (Id.).

EMG testing on July 1, 2014 revealed that "[a]ll sensory and motor nerve conductions are within normal limits." (Tr. 144).

On September 14, 2015, LaFave was examined by Blair T. Alexander, DC, while visiting her mother-in-law in New Mexico. (Tr. 155-57, 467). LaFave reported that she was unable to pick up anything without severe pain and was limited to lifting one to two pounds. (Tr. 155). She stated that she could not bend and lift things off the floor due to severe neck and upper back pain

and that she suffered from inflammation, decreased range of motion, stiffness, and pain in her lumbar spine.  (Id.).  On examination, LaFave was alert, healthy, cooperative, and had normal speech and good communication.  (Tr. 156).  Mr. Alexander found that LaFave suffered from soreness, sensitivity, and stiffness of neck and shoulder muscles bilaterally, stiffness and soreness of the cervical and thoracic spine, and reduced range of motion with pain in the cervical spine. (Id.).  Mr. Alexander assessed kyphosis associated with other conditions, cervical spondylosis with myelopathy, neck sprain, unspecified myalgia and myositis, and degeneration of cervical intervertebral disc.  (Id.).  Stating that his prognosis was "guarded," Mr. Alexander restricted LaFave from "[a]ny type of lifting until understanding of cervical imbrication is understood." (Id.).  Noting that LaFave was visiting from out of town and would return home that week, Mr. Alexander stated that LaFave would "be given options to continue conservative care" and that she might need a surgical consultation.  (Id.).

D.    Function Report

On August 31, 2012, LaFave completed a function report.  (Tr. 95-100).  LaFave stated that, on a typical day, she made herself a cup of tea, and then made the bed with her husband's help.  (Tr. 95-96).  She stated that she was able to do the dishes by selecting lightweight dishes that did not place pressure on her neck and leaving the remainder for her husband.  (Tr. 96). LaFave noted that she could not lift a glass measuring cup, a ceramic coffee cup, or any pots or pans.  (Id.).  She indicated she could shower adequately if her husband premeasured her shampoo and conditioner bottles for her to lift and use.  (Id.).  LaFave stated that she left "[a]ll household chores" for her husband and that she was unable to shop alone because she could not pick up even a can of soup.  (Id.).

LaFave reported that she could not cook but could "spread mayonnaise on bread" if her husband fetched the jar from the refrigerator.  (Tr. 99).  LaFave stated that she went outside almost every day and was generally accompanied by her husband.  (Tr. 100).  LaFave noted that she went grocery shopping with her husband two to three times a month for thirty minutes to one hour each trip.  (Id.).  She indicated that she could use a checkbook, handle a savings account, and count change, although she could not pick up a roll of coins, but could not pay bills.  (Tr. 100-01).  LaFave reported enjoying reading, watching television, and playing cards with her husband.  (Tr. 101).  She stated that she talks to her friends on the phone and occasionally goes out for lunch.  (Id.).  LaFave reported regular attendance at a Monday night prayer meeting and a Wednesday Bible study as well as regular trips to Walgreens.  (Id.).  She reported that she did not have problems getting along with others and got along very well with authority figures.  (Tr. 102, 104).

LaFave stated that her condition affected her ability to lift, squat, bend, reach, kneel, climb stairs, complete tasks, and the use of her hands.  (Tr. 102).  She reported that she was able to walk a half-mile before needing to stop and rest fifteen to twenty minutes prior to continuing.  (Id.).  LaFave stated that she used glasses but no other assistive device.  (Tr. 104).

E.    Hearing Testimony

A hearing before the ALJ was held on July 12, 2016, where LaFave, her husband, and a vocational expert ("VE") gave testimony.  (Tr. 454-82).

LaFave testified that she was unable to work because she could not bend, squat, or pick up anything significant due to neck, shoulder, and back problems stemming from a car accident in 2007.  (Tr. 466-67).  She stated that she had problems with her left hand but could lift "[m]aybe half of a, half of a little pint" with her right hand but could not lift anything over one pound.  (Tr.

469, 473).  She indicated that she could bathe and groom herself with difficulty and could walk one mile.  (Tr. 469-70).

LaFave stated that she enjoys reading and that her husband accompanies her to the library. (Tr. 470).  She indicated that she uses the internet to view Christian songs and that she was very involved with her Church, attending every Sunday and some Wednesdays.  (Tr. 471).

LaFave testified that she had high blood pressure for which she was on medication.  (Tr. 468).  She indicated that she had been evaluated for multiple sclerosis but was determined not to have it.  (Tr. 469).  She denied any mental health issues.  (Id.).

LaFave stated that her most recent treatment for her neck or back impairments was a visit to a chiropractor in New Mexico "for a little gentle treatment."  (Tr. 467).  She testified that she has received steroid injections and physical therapy, and that she was not a candidate for surgery. (Id.).  LaFave stated that she took ibuprofen for pain, "sometimes three days in a row, every four hours."  (Tr. 468).  She described her pain as a six or seven on a scale of ten with medication and as a "ten-plus" without any medication.  (Id.).

LaFave's husband testified that he had to do "everything" for LaFave including cooking meals, shopping for groceries, laundry, and all the housecleaning.  (Tr. 475).  He stated that a can of vegetables was too heavy for LaFave and that she could not bend down to pick up an object off the floor.  (Id.).  LaFave's husband also observed that she could not do things in repetition and needed pillows to support her back when sitting.  (Tr. 480).

Following LaFave and her husband's testimony, the ALJ asked the VE to consider:

> a hypothetical individual of an age that ranges from . . . 54 to 59, education level, work experience, or lack thereof . . . limited as follows, to medium exertion which is unskilled in nature.  Work should not entail any direct overhead lifting or reaching.  Work should entail no more than frequent and frequent being defined as up to two-thirds of the workday; grasping pinching or twisting with the left hand and arm.

Work should not be in environments having more th[an] incidental exposure to extremes of cold or vibration.  Work should not be performed at heights, using ladders, ropes or scaffolding.  Work should entail no more than occasional and occasional being defined as up to one-third of the workday, use of ramps, stairs, stooping, crouching, crawling and kneeling.

Would an individual so limited be able to perform [LaFave's] past – or be[] able to perform jobs in the local or national economy?

(Tr. 477-78).  The VE responded that the hypothetical individual could perform work in a packaging position consisting of 200,000 jobs nationally and 950 in Massachusetts, as an inspector consisting of 140,000 jobs nationally and 800 in Massachusetts, and as a warehouse worker consisting of 135,000 jobs nationally and 650 in Massachusetts.  (Tr. 478).  The VE then testified that, if all the limitations stayed the same but the ability to manipulate the left hand and arm were not more than occasional, it would eliminate the inspector positions.  (Id.).  The VE further testified that, if all limitations were kept the same as in the first hypothetical but the exertional capacity was reduced to light, the individual could perform work as a mail sorter consisting of 125,000 positions nationally and 1,100 in Massachusetts, an inspector consisting of 150,000 positions nationally and 900 in Massachusetts, and in a packaging position consisting of 120,000 jobs nationally and 875 in Massachusetts.  (Tr. 478-79).  The VE also testified that, if the hypothetical individual were to be off task from any work duties for at least 25 percent of the work-day, such individual would not be employable.  (Tr. 479).

F.    Administrative Decision

In assessing LaFave's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 416.920; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

13

First, the ALJ considers the claimant's work activity and determines whether she is "doing substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that she is not disabled.  Id.  The ALJ found that LaFave had not engaged in substantial gainful activity since January 24, 2011, the application date.  (Tr. 33).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 416.920(a)(4)(ii).  The ALJ determined that LaFave's degenerative disc disease and hypertension were severe impairments.  (Tr. 33).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that LaFave did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 35).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 416.920(e).  An individual's RFC is her ability to do physical and mental work activities on a sustained basis, despite limitations from her impairments.  20 C.F.R. § 416.945(a)(1).  Here, the ALJ found:

> [LaFave] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that the claimant is limited to work that involves unskilled tasks.  She is unable to engaged in direct overhead lifting or reaching. The claimant is limited to work that allows for no more than incidental exposure to

extremes of cold and vibration.  The claimant must avoid work performed at heights, ladders or using ropes of scaffolding.  She is limited to work that requires no more than occasional climbing of ramps, stairs, crouching, crawling, and bending.

(Tr. 36).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy.  20 C.F.R. § 416.920(a)(4)(v).  The ALJ determined that, based upon her RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that LaFave can perform.  (Tr. 45).  Accordingly, the ALJ found that LaFave had not been under a disability since January 24, 2011, the date the application was filed.  (Tr. 46).

## II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).

Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that she is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.    ANALYSIS

A.    Credibility Determination

LaFave argues that the ALJ erred by failing to properly consider her subjective complaints, and that this error resulted in a flawed RFC.  (Docket #17 at 3).  The ALJ found that LaFave's medically determinable impairments could reasonably be expected to cause the symptoms alleged by LaFave, but LaFave's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC.  (Tr. 38).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve the applicant."  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  If the ALJ finds that a

claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors." Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam). Known as the "Avery factors," these descriptions must be carefully considered by the ALJ before he declares the claimant not to be credible. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

The ALJ advanced three reasons, which touch on the Avery factors, for finding that LaFave was not fully credible.

First, the ALJ found that LaFave's activities of daily living were inconsistent with LaFave's allegedly disabling symptoms. (Tr. 38). "While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010). The ALJ noted that LaFave reported that she had telephone conversations with friends, occasionally went out for lunch, attended Monday night prayer at her church, and Bible study class on Wednesday nights. (Tr. 38). LaFave also denied having any problems getting along with family, friends, or neighbors. (Id.). She reported that she could walk one mile. (Id.). Furthermore, LaFave stated that she was able to perform a number of self-care tasks, noting only that she did so at her own pace. (Id.). These findings are all supported by the record and were properly considered by the ALJ.

Second, the ALJ noted that a review of the medical evidence of record confirmed a history of anxiety reaction, but that the claimant had not generally received the type of psychiatric treatment one would expect for a totally disabled individual. (Tr. 39). The ALJ observed that the

record did not reveal evidence of frequent trips to the doctor or the emergency room due to the allegedly disabling symptoms nor were there frequent or extended psychiatric hospitalizations. (Id.).  The ALJ properly considered this evidence which was adequately supported in the record. See Pressley v. Berryhill, No. 16-40050, 2017 WL 5760915, at *14 (D. Mass. Sept. 8, 2017) (noting that "courts in this district have found that [a lack of psychiatric hospitalizations] is an appropriate factor for the ALJ to consider in determining the weight to give a medical source opinion").

Finally, the ALJ stated that his observations of LaFave's demeanor at the hearing supported his credibility determination, noting that LaFave manifested no evidence of pain or discomfort or psychiatric symptoms despite her allegations of disabling pain.  (Tr. 39).  While the ALJ conceded that the hearing "was short-lived and cannot be considered a conclusive indicator of [LaFave's] overall level of pain or psychiatric symptoms on a day-to-day basis, the apparent lack of discomfort and psychiatric symptoms during the hearing is given some slight weight[.]"  (Id.).  The undersigned finds that this was an appropriate factor for the ALJ to consider in making his credibility determination.  See SSR 96-7p ("In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but should consider any personal observations in the overall evaluation of the credibility of the individual's statements."); Teixeira, 755 F. Supp. 2d at 347 (stating that it was "particularly appropriate" to consider claimant's demeanor in making credibility assessment where claimant testified that she constantly suffered pain rated at an eight out of ten).  The undersigned notes that LaFave's demeanor was only one factor that the ALJ considered among others in assessing her credibility.  Cf. Miller v. Sullivan, 953 F.2d 417, 422

(8th Cir. 1992) ("Although the demeanor of a claimant may be noticed by an ALJ, the ALJ cannot reject a claimant's credibility on account of failure to 'sit and squirm' during a hearing.").

B.      Weight of Medical Opinions

LaFave asserts that the ALJ discounted the opinion of Mr. Alexander without providing adequate reasoning and, therefore, substantial evidence does not support the ALJ's determination. (Docket #14 at 4).

As an initial matter, Mr. Alexander, a chiropractor, was not an "acceptable medical source" as that term was defined at the time of the ALJ's decision.   See 20 C.F.R. 416.913(a) (2016). Social Security Ruling 06-3p, which was in effect as of the date of the ALJ's decision, precluded an ALJ from giving controlling weight to opinions from those who are not "acceptable medical sources."   SSR 06-03p, 2006 WL 2329939, at *2, rescinded by Federal Register Notice Vol. 82, No, 57, page 15263 for claims filed on or after March 27, 2017 ("[O]nly 'acceptable medical sources' can be considered treating sources as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").   Because Mr. Alexander, as a chiropractor, is not an "acceptable medical source" under those regulations, his opinions are not entitled to controlling weight.   See 20 C.F.R. 416.913(d)(1) (2016) (defining "other sources"); see also, e.g., Mantilla v. Colvin, No. 15-11913-FDS, 2016 U.S. Dist. LEXIS 90971, at *21-22 (D. Mass. July 13, 2016) (opinions of chiropractor are not entitled to controlling weight because he is not an "acceptable medical source").   However, Mr. Alexander is an "other source," whose opinion must be appropriately weighted.

An ALJ may not "ignore 'other medical sources' or fail to adequately explain the weight given to such evidence."   Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012).   "Thus, although 'other medical sources' are not entitled to controlling weight and an administrative law

19

judge is not required to provide 'good reasons' for the weight assigned to such opinions nor consult the factors listed in 20 C.F.R. §§ 416.927(C)(2)-(6) [or 404.1527(c)(2)-(6)], [the ALJ] still must adequately explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence." Id. at 88-89.

Contrary to LaFave's assertion, the ALJ considered the progress notes provided by Mr. Alexander. (See Tr. 43). The ALJ gave "some, but not great weight" to his assessment. (Id.). The ALJ noted that Mr. Alexander's opinion contrasted sharply with the results of physical examinations of LaFave and the records of Dr. Child, rendering it less persuasive. (Id.). While Mr. Alexander did have the opportunity to examine LaFave in person, he did not provide her with regular or frequent treatment. (Id.); see SSR 06-03p, 2006 WL 2329939, at *4 (stating that although the factors of 20 C.F.R. § 416.927(d), including how long the source has known and how frequently the source has seen the individual and the consistency of the opinion with other evidence, explicitly only apply to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources"). Additionally, the ALJ explained that while LaFave's neck, back, shoulder, and arm pain was allegedly disabling, she had only received generally routine and conservative treatment. (Tr. 43). The ALJ noted that LaFave had not been advised to use an assistive device while walking or constantly wear a neck collar or brace. (Id.). The ALJ further found that significant gaps in LaFave's treatment for her impairments cut against a finding of a disability. (Id.); see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1993) (viewing gaps in treatment as "evidence" that "conflicted with claimant's allegations of unrelenting pain"). These observations are all supported by the record. Thus, the undersigned finds that the ALJ reasonably

accorded some, but not great, weight to Mr. Alexander's opinions, and sufficiently explained the bases for that decision.

C.      Substantial Evidence

Having reviewed the record, the undersigned concludes that substantial evidence supports the ALJ's decision that LaFave was not disabled from her January 24, 2011 application date through September 28, 2016, the date of the decision.

As noted by the ALJ, the examining sources' physical examinations failed to reveal objective signs and symptoms of a disabling nature, severity, frequency, and duration due to degenerative disc disease.  (Tr. 39).  In January 2011, Dr. Katz found that LaFave had full muscle strength in her upper and lower extremities with normal muscle bulk and tone, normal sensation, and normal fine motor movement in both hands.  (Tr. 419).   In July 2011, LaFave had normal findings related to her sensory and neurological systems and normal strength.  (Tr. 366).   In October 2011 and May 2012, emergency department examinations revealed no abnormal back or extremities findings and grossly intact sensory and motor functions.  (Tr. 376, 382).  In May 2014, Dr. Bagla found LaFave had normal shoulder movements, was "strong throughout," with normal muscle tone and bulk, intact coordination in the upper and lower extremities, intact sensation to all modalities, and a steady tandem gait.  (Tr. 134).  EMG testing in July 2014 revealed that "[a]ll sensory and motor nerve conductions were within normal limits."  (Tr. 144).  Treatment notes from Dr. Child's practice regularly revealed that LaFave was not in distress, and that her pulses were symmetrical with no evidence of any edema.  (Tr. 391, 393, 395-96).

The ALJ supportably gave "significant weight" to the observations, diagnoses, and conclusions of Dr. Child based on his treating relationship with LaFave, his well-documented progress notes, and his physical examinations of LaFave, all proper factors for consideration

pursuant to 20 C.F.R. § 416.927(c).  (See Tr. 42).  In March 2011, Dr. Child completed an opinion assessment related to LaFave's disc disease impairment.  (Tr. 421-22).  Dr. Child noted that LaFave had longstanding complaints of intermittent weakness, but opined that she was "functional."  (Tr. 422).  In August 2012, Dr. Child recommended a psychiatric evaluation as her physical symptoms "sound functional."  (Tr. 391-92).  The ALJ noted that Dr. Child's conclusions were consistent with the results of mental status examinations, physical examinations, and the record evidence that revealed LaFave was able to partake in several activities despite her impairments.  (Tr. 42).

D.     Additional Evidence

LaFave asserts that, between the date of decision and the present day, she has "acquired more information through documented test results" and is "presently going through more testing" as she had changed her doctor.  (Docket #14 at 4).  However, this court cannot consider evidence not before the ALJ.  See Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001) ("To weigh the new evidence as if it were before the ALJ would be, as one court fairly observed, a very peculiar enterprise, and (to us) one that distorts analysis") (emphasis, citation, and quotations omitted); Madden v. Barnhart, No. CIV-A. 01-11610-GAO, 2002 WL 31077019, at *5 (D. Mass. Sept. 17, 2002) ("The Court does not consider evidence that was not before the ALJ in determining whether the ALJ's findings were supported by substantial evidence").

IV.    CONCLUSION

For the foregoing reasons, I RECOMMEND that LaFave's Motion for Order Reversing Decision of Commissioner (Docket #14) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #15) be ALLOWED.[4]


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[4] The parties are notified that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of service of this Report and Recommendation. The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See FED. R. CIV. P. 72(b)(2). The United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See, e.g., United States v. Diaz-Rosado, 857 F.3d 89, 94 (1st Cir. 2017); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).